# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF TENNESSEE
### AT KNOXVILLE

| | | |
|---|---|---|
| KNOX TRAILERS, INC., and POST TRAILER REPAIRS, INC., | ) ) ) | Case No. 3:20-cv-137 |
| *Plaintiffs*, | ) ) | Judge Travis R. McDonough |
| v. | ) ) | Magistrate Judge Debra C. Poplin |
| JEFF CLARK, AMY CLARK, PAUL HENEGAR, ROY BAILEY, BILLY MAPLES, AMANDA MAPLES, , STEPHEN POWELL, HEATH BROWNLEE, and TITAN TRAILER REPAIRS & SALES, LLC, | ) ) ) ) ) ) ) | |
| *Defendants*. | ) ) | |

---

## MEMORANDUM OPINION

---

Before the Court is Plaintiffs' motion for preliminary injunction (Doc. 84). In their motion for preliminary injunction, Plaintiffs seek to enjoin Defendants Billy Maples and Titan Trailers Repairs & Sales, LLC ("Titan Trailers") "from using the Database, or any document or other tangible thing derived from information in the Database." (*Id.* at 1; *see also* Doc. 85, at 5 (referring to the company databases of Knox Trailers, Inc. and Post Trailer Repairs, Inc. collectively as "the Database").) For the following reasons, the Court will **GRANT** the motion.

## I. BACKGROUND

Plaintiff Knox Trailers, Inc. ("Knox Trailers") operates a trailer sales and repair company in Knoxville, Tennessee. (Doc. 85, at 5.) Plaintiff Post Trailer Repairs, Inc. ("Post Trailer"), Knox Trailers's sister company also located in Knoxville, Tennessee, repairs fuel tanks, trucks, and trailers. (*Id.* at 5–6.) Since 2003, Plaintiffs have used Southware, a resource-planning

software, to manage information related to their business operations. (*Id.* at 6.) Plaintiffs' Southware system is customized to suit their particular business needs. (Doc. 115, at 14–15.) Plaintiffs store various types of information in their Southware databases ("the Databases"), including customer information, vendor information, parts-pricing information, service-pricing information, order history, vendor history, customer communications, and customized reports. (Doc. 85, at 6–7.) According to Rick Hensley, CEO of Knox Trailers and Post Trailer, "[a]ll the business activities [of Plaintiffs] are supposed to be tracked through . . . Southware." (Doc. 115, at 14.) Hensley estimated that Plaintiffs have spent approximately $350,000 to build and maintain the Databases. (*Id.* at 27.)

The Databases are password-protected, and access is tiered so that certain users are limited in the information and functionalities they can access. (Doc. 85, at 9.) Employees with access to the Databases were assigned logins and created their own passwords. (Doc. 115, at 12.) Knox Trailers and Post Trailer maintain separate Databases, though some high-level employees have access to both Databases. (Doc. 85, at 9–10; Doc. 91, at 6.) The Databases are only accessible at Plaintiffs' offices unless remote access is specifically granted to an employee. (Doc. 115, at 69.)

Defendant Billy Maples, who served as general manager for Knox Trailers and Post Trailer, was an employee who had access to both Databases and could access them remotely. (*Id.* at 69–70; Doc. 85, at 9–10; Doc. 91, at 6.) Maples was not asked to execute a noncompetition, nondisclosure, or other confidentiality agreement while employed by Knox Trailers or Post Trailer. (Doc. 91, at 3.) Maples also represents that no owner or representative of either company asked or directed him to prevent the disclosure of the information contained in

the Databases.  (*Id.* at 3–4.)  Around December 2019, Maples and Defendant Heath Brownlee

began discussing plans to open a competing trailer repair business.  (*See* Doc. 115, at 98–102.)

On February 20, 2020, while employed by Plaintiffs, Maples downloaded the Databases

onto a USB device with the help of Defendant Stephen Powell, who had previously worked for

Plaintiffs to help manage the Databases.  (Doc. 85, at 10–11; Doc. 91, at 6.)  That day, Maples

and Powell engaged in the following exchange by text message:

| | |
|---|---|
| Maples: | When you get a second I wanted to talk to you about that other download I need to do.  Also about what your schedule will be like at Denso because I'd like to pay you to help me get things up and running plus maybe put you on a retainer.  Make ya a little more $ |
| Powell: | I've got time today to talk, or probably tomorrow. |
| Maples: | I'll call ya in a bit if that's ok |
| Powell: | Should be fine |
| | . . . |
| Maples: | File is too big to send to my desktop I guess.  Anyway I can download it from my remote to my usb drive? |
| Maples: | If I created a zip file would that mess things up, I might be able to do that then drag to desktop then download? |
| Powell: | A zip file shouldn't create any problems I have done that before |
| Maples: | Wouldn't be any problems opening everything back up in the new system? |
| Powell: | No we would just unzip it and it should be fine.  At that point I would want to do a rebuild of all the Southware files because that's just a good thing to do, and then we will have to adjust file paths to match. |
| Maples: | I think I got it finally on the regular but I will do a zip also just in case |
| Powell: | Okay, I've zipped and copied Southware many times over the years and it never caused me any problems |

3

(Doc. 84-3, at 2–3.)  Maples later testified that, at the time of the download, he "did not know what [he] had downloaded" and "only thought [he] was cloning the system itself," akin to a blank Southware system "like [he] would be purchasing it."[1]  (Doc. 115, at 85)

After completing the download, Maples asked Powell to use the downloaded Databases to set up a Southware database for Maples's new company, Titan Trailers.  (Doc. 85, at 11; Doc. 115, at 85.)  Specifically, on March 2, 2020, Maples texted Powell, "Let's get that server ordered today.  What ya think?  That way I can get you that flash drive to you [sic.] to start setting up Southware."  (Doc. 84-3, at 15.)  In his response to the motion for preliminary injunction, Maples misleadingly contends that he gave the information to Powell "for safekeeping" after he "determined it was not advisable that he personally access that information or retain it in his possession."  (Doc. 91, at 6–7.)  He also represents that he "never thereafter accessed that data personally or attempted to install or download any of the information from the KTI/Post operating system from the USB device onto his own or Titan's computers or other storage devices."  (*Id.* at 7.)  However, Maples subsequently testified, consistent with the March 2, 2020 text message, that he gave the USB drive with the Databases to Powell "so that [Titan Trailers] could have a SouthWare system to work off of.  (Doc. 115, at 85.)

On March 5, 2020, Maples resigned from his job with Plaintiffs.  (Doc. 85, at 12; Doc. 67, at 15.)  On March 11, 2020, Maples and Powell had the following text exchange:

Maples: Don't set anything up from Southware that is captive to Knox
    Trailer Pricing or history of sales or ordering if that's possible.

Powell: No problem

---

[1] The Court notes that Maples's and Powell's concduct in downloading and setting up a new Southware system without a license may violate 17 U.S.C. § 506 and be subject to punishment under 18 U.S.C. § 2319.

| Maples: | I just need the operating system honestly and that's what me you and paul talked about that day. Don't know if it would ever come up but I want to protect everyone. If there is ever any issues [sic.] it's all me and I'm good [with] it. |
| --- | --- |
| Powell: | You will have customers, vendors, and inventory but no history of anything. Sound about right? |
| Maples: | I believe that's what we need. You ok [with] that? |
| Powell: | Yes |

(Doc. 84-3, at 29–30.) Then, on March 19, 2020, they sent the following messages:

| Powell: | Southware is installed with the license and key they sent today. I'll wait to set up printers in Southware until Sunday because if I did it now I'd have to do it all over again on Sunday anyway. |
| --- | --- |
| Maples: | Wow that's awesome |
| | Anything on it that could get me in trouble? Nothing price or history correct? |
| Powell: | Correct |

(*Id.* at 33–34.)

Maples represents that he used the downloaded information for the Titan Trailers Southware system "in order to save time over manual inputting." (Doc. 91, at 7; *see also* Doc. 115, at 92 (Maples testifying that he imported Plaintiff's information "to get a quick start" and "try to get the company up and running quicker").) He later testified that he did not buy a system directly from Southware to save money, though he later had to purchase a license to use the Southware Databases downloaded from Plaintiffs. (*See* Doc. 115, at 90 ("It was just money. It was me just trying to start a business, and I didn't know the expense of it."); *id.* at 93 (Maples stating that he "tried to clone the system so that we could save money").)

In his response to the motion for preliminary injunction, Maples represents that he regularly accesses Titan Trailers's Southware program but that, "[i]n the course of his regular access[,] he has not detected any customer or vender information within it that would have come

5

from KTI/Post's data other than the limited customer and vendor contact information he discussed with Mr. Powell." (Doc. 91, at 7.) Maples further represents that all customer contact information that was imported from Plaintiffs' Databases was "already independently available to Maples in his personally owned smart phone contacts list," which was "independently developed and inputted by Maples for many years preceding his departure from KTI/Post." (*Id.* at 8.) Maples subsequently testified that Defendants are not using any pricing history that was downloaded from the Databases, but they do "use the pricing that we have knowledge of from the customer [from] [their] past experience." (Doc. 115, at 104–05.) However, Robert Elliott, owner of Flexware Systems, Inc. and consultant on business software solutions, testified at the preliminary injunction hearing that, from a sample comparing parts pricing between Knox Trailers and Titan Trailer, there was consistently a 1.43 price multiplier at Titan Trailer for items with 1.45 multiplier at Knox Trailers. (*Id.* at 181.) The expert opined that the likelihood that the pricing information had been imported was much greater than the "theoretical alternative . . . that [Titan Trailer] typed in more than 1,000 stock items and entered in the 1.43 price multiplier every single time without error." (*Id.* at 182.)

Plaintiffs filed this action in the Chancery Court for Knox County, Tennessee, on March 19, 2020, asserting claims for breach of fiduciary duty, intentional interference with business relationships, unfair competition, conversion, fraud, and federal and Tennessee trade-secrets claims. (*See* Doc. 1-2.) Plaintiffs moved for a temporary restraining order, which the Chancery Court granted the same day. (*See* Doc. 85, at 12.) The temporary restraining order restrained Defendants from:

> A. . . . contacting, soliciting, or communicating with existing customers and current or available vendors and suppliers, and any employees (current or future employees at the time of any future contract or communication) of Knox Trailers, Inc.;

B. . . . directly or indirectly operating a trailer retail and repair store operation, or otherwise engaging in the service or repair of trailers, parts or accessories within a two hundred (200) mile radius of 1905 Middlebrook Pike, Knoxville, Tennessee 37921[; and]

C. . . . directly or indirectly selling, offering to sell or soliciting for sale, or in any way soliciting, diverting, taking away or attempting to take away any of the customers or account of Plaintiff for which Defendants received information regarding such accounts due to Defendants' employment with Plaintiff[.]

(Doc. 84-10, at 4.)

Plaintiffs represent that, on March 21, 2020, someone accessed Post Trailer's Database using Maples's credentials. (Doc. 84-2, at 10.) On March 22, 2020, someone accessed Knox Trailers's Database using Maples's credentials. (*Id.*) Upon Defendants' motion, the temporary restraining order was dissolved by the Chancery Court on March 26, 2020. (*See* Doc. 1-3.) Titan Trailers began business operations on March 30, 2020 (Doc. 91, at 2), and Defendants removed this action to this Court on March 31, 2020 (*see* Doc. 1).

Plaintiffs represent that they did not move for preliminary injunction in state court because Maples and Titan Trailers repeatedly denied having downloaded the Databases. (Doc. 85, at 13.) However, more recently, Maples admitted that he gave the USB with the Databases on it to his attorney some time in March or April 2020 and that, at that time, he knew that the USB contained Plaintiffs' software, including customer information, vendor information, service and pricing histories, and inventory. (Doc. 115, at 93.) In late November or early December 2020, counsel for Maples and Titan disclosed the existence of the USB drive to Plaintiffs' counsel, and the parties' agreed to turn the USB drive over to a neutral forensic expert for review. (*Id.*) After disclosing the USB drive and submitting it to the expert, Maples and Titan Trailer provided Plaintiffs with supplemental discovery, which included the text messages between Maples and Powell. (*Id.*)

Plaintiffs filed the instant motion for preliminary injunction against Maples and Titan Trailers on March 8, 2021 (Doc. 84). The Court held an evidentiary hearing on April 27, 2021. (*See* Doc. 113.) At the hearing, the Court heard testimony from Rick Hensley, Defendant Billy Maples, and expert witness Robert Elliott. (*See* Doc. 115, at 2.)

## II.    STANDARD OF REVIEW

"The purpose of a preliminary injunction is merely to preserve the relative positions of the parties until a trial on the merits can be held." *Certified Restoration Dry Cleaning Network, L.L.C. v. Tenke Corp.*, 511 F.3d 535, 542 (6th Cir. 2007) (quoting *Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981)). In the Sixth Circuit, a district court is not required to hold an evidentiary hearing on a motion for preliminary injunction when the material facts are not in dispute. *Id.* at 553. However, a district court must hold an evidentiary hearing when facts related to the motion are in dispute. *Id.*

The Court considers the following factors when evaluating a motion for preliminary injunction:

> (1) whether the movant has a strong likelihood of success on the merits;
> (2) whether the movant would suffer irreparable injury without the injunction;
> (3) whether issuance of the injunction would cause substantial harm to others; and
> (4) whether the public interest would be served by the issuance of the injunction.

*Id.* at 542 (citations omitted). The Court need not "make specific findings concerning each of the four factors . . . if fewer factors are dispositive of the issue." *Id.* (citations omitted). However, "it is generally useful for the district court to analyze all four of the preliminary injunction factors." *Id.* (quoting *Leary v. Daeschner*, 228 F.3d 729, 739 n.3 (6th Cir. 2000)).

While a party seeking a preliminary injunction need not "prove [its] case in full at a preliminary injunction hearing," *id.* (citations omitted), a preliminary injunction is an "extraordinary and drastic remedy." *Fowler v. Benson*, 924 F.3d 247, 256 (6th Cir. 2019)

(quoting *Munaf v. Geren*, 553 U.S. 674, 689 (2008)).  A preliminary injunction "may only be awarded upon a clear showing that the plaintiff is entitled to such relief," *id.* (quoting *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008)), and "the proof required for the plaintiff to obtain a preliminary injunction is much more stringent than the proof required to survive a summary judgment motion." *Leary*, 228 F.3d at 739.

## III.    ANALYSIS

### A.  Likelihood of Success on the Merits

Plaintiffs make several claims against Maples, Titan Trailers, and many others, but they list only four as relevant to their request for preliminary injunction:  their trade-secrets claims, unfair-competition claims, breach-of-fiduciary-duty claims, and conversion claims.

#### i.  *Trade-Secrets Claims*

Under Tennessee common law, a plaintiff asserting a claim for misappropriation of trade secrets needed to prove:

> (1) the existence of a trade secret; (2) communication of that trade secret to the defendant while the defendant was in a position of trust and confidence; (3) use of the trade secret; and (4) damage to the plaintiff.

*Hamilton-Ryker Grp., LLC v. Keymon*, No. W200800936COAR3CV, 2010 WL 323057, at *13 (Tenn. Ct. App. Jan. 28, 2010).  In 2000, the Tennessee legislature enacted the Tennessee Uniform Trade Secrets Act ("the TUTSA" or "the Act"), which "preempts and displaces conflicting or inconsistent common law in Tennessee regarding the misappropriation of trade secrets." *Id.* at *14 (citations omitted); *see also PartyLite Gifts, Inc. v. Swiss Colony Occasions*, 246 F. App'x 969, 974 (6th Cir. 2007) ("Pre-statute cases that consider the factors listed in the statute's definition of 'trade secret' are not invalid simply by virtue of the statute's passage.").

The TUTSA provides for injunctive relief or damages for a successful claimant.  *See* Tenn. Code. Ann. §§ 47-25-1703, 47-25-1704.  However, damages are not available "to the

extent that defendant can show a material and prejudicial change of position prior to acquiring

knowledge or reason to know of misappropriation and such renders a monetary recovery

inequitable." *Id.* § 47-25-1704. The Act defines a "trade secret" as:

> information, without regard to form, including, but not limited to, technical, nontechnical or financial data, a formula, pattern, compilation, program, device, method, technique, process, or plan that:
>
> > (A) Derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by other persons who can obtain economic value from its disclosure or use; and
> >
> > (B) Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

*Id.* § 47-25-1702(4). It defines "misappropriation" as:

> (A) Acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means; or
>
> (B) Disclosure or use of a trade secret of another without express or implied consent by a person who:
>
> > (i) Used improper means to acquire knowledge of the trade secret; or
> >
> > (ii) At the time of disclosure or use, knew or had reason to know that that person's knowledge of the trade secret was:
> >
> > > (a) Derived from or through a person who had utilized improper means to acquire it;
> > >
> > > (b) Acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use; or
> > >
> > > (c) Derived from or through a person who owed a duty to the person seeking relief to maintain its secrecy or limit its use; or
> >
> > (iii) Before a material change of the person's position, knew or had reason to know that it was a trade secret and that knowledge of it had been acquired by accident or mistake[.]

*Id.* § 47-25-1702(2).  The TUTSA further explains that "improper means" include "theft, bribery, misrepresentation, breach or inducement of a breach of a duty to maintain secrecy or limit use, or espionage through electronic or other means."  *Id.* § 47-25-1702(1).

    a.   Whether the Information in the Databases Constitute Trade Secrets

The parties' main dispute concerning the likelihood of success of Plaintiffs' Tennessee trade-secrets claims is whether the Databases qualify as "trade secrets."  (*See* Doc. 85, at 16; Doc. 91, at 12.)  The Sixth Circuit has identified the following nonexhaustive list of factors as relevant to this inquiry:  "the extent of public knowledge; measures taken to guard its secrecy; the value of the information both to the business and to its competitors; money that was spent to develop the information; and the ease or difficulty with which it could be acquired by outsiders." *PartyLite*, 246 F. App'x at 973 (citing *Wright Med. Tech., Inc. v. Grisoni*, 135 S.W.3d 561, 589 (Tenn. Ct. App. 2001)).

*1.  Public Knowledge*

"[T]he extent to which the information has become available outside the confidential relationship is significant.  To constitute a trade secret, it must be difficult for anyone outside the confidential relationship to acquire the information by proper means."  *Wright Med. Tech.*, 135 S.W.3d at 589 (citing *Hickory Specialties, Inc. v. B & L Labs., Inc.*, 592 S.W.2d 583, 587 (Tenn. Ct. App. 1979)).  Thus, "[i]nformation which has become readily available through public sources or is generally well known in the industry cannot be considered confidential."  *Id.* Nevertheless, "information which was acquired by the defendant through the confidential relationship may be protected even if the information potentially could have been obtained through independent research," particularly when "acquisition of the information though independent research would be difficult, costly, or time consuming."  *Id.* (citations omitted); *cf.*

*Hickory Specialties*, 592 S.W.2d at 587 ("The potential to develop the process by independent technology[] affords the defendants no excuse to obtain the process through a confidential employer-employee relationship and then compete with the developer.") (citations omitted).

Defendants attempt to characterize the Databases as composed of information that is readily available from other sources and cite to Tennessee cases rejecting trade-secret protection for some of these types of information. (*See* Doc. 91, at 14–15.) However, "[t]he fact that some or all of the components of the trade secret are well-known does not preclude protection for a secret combination, compilation, or integration of the individual elements." *Wright Med. Tech.*, 135 S.W.3d at 589 (quoting *Essex Grp., Inc. v. Southwire Co.*, 501 S.E.2d 501, 503 (Ga. 1998)). Here, Plaintiffs presented evidence of the vastness of information included in the Databases, as well as the customization of their systems to allow for the interaction and analysis of that information. (*See* Doc. 115, at 26–28.) Hensley also testified that Plaintiffs do not share their customizations with anyone outside of Knox Trailers and Post Trailer. (*Id.* at 26.) Though a single piece of data, such as a customer name or an old invoice, may be available to others within the field, the entire collection of data is not publicly available, and the independent duplication of the system and collection of all the data from independent sources would be painstaking and expensive. (*See id.* at 26–28.)

## 2. Secrecy Measures

This factor will support trade-secret status when there is "a substantial element of secrecy so that a third person would have difficulty in acquiring the necessary information . . . without resorting to the use of improper means." *Hickory Specialties*, 592 S.W.2d at 587. "[A]bsolute secrecy is not required." *Id.* Instead, the TUTSA clarifies that the information need only be

protected by secrecy measures that are "reasonable under the circumstances." Tenn. Code Ann. § 47-25-1702(4)(B).

Plaintiffs represent that they have taken the following measures to protect the secrecy of the Databases:

> making the Database[s] accessible by password only, segregating the Database[s] into separate accounts with Knox Trailers and Post Trailer, orally directing employees to regard the Database[s] as proprietary and not share it, implementing tiered access to limit user functionality, and only allowing high level employees (like Mr. Maples) too access the Database[s] outside of work.

(Doc. 85, at 20.) Although Defendants sought to call into question the complexity of the passwords Plaintiffs' employees use to access the Databases, this does not render Plaintiffs' secrecy measures unreasonable under the circumstances. The evidence presented suggests it would be difficult for any non-employee to access the information in the Databases by lawful means, and even employees without the level of authority Maples had would have difficulty accessing the volume of information that he was able to download.

### 3. Value of Information to Plaintiffs and Defendants

The value of the Databases to both Plaintiffs and Defendants is substantial. Hensley testified that the value of the information in the Databases to Plaintiffs was incalculable. (Doc. 115, at 15 ("[T]he full database and how it interacts with each other is one of the most valuable assets of any company. I think you can't calculate the value."); *see also id.* at 27–28 (Hensley describing the damage Plaintiffs would incur from the theft of the information as "immeasurable").) Moreover, Maples admitted that the information in the Databases, as well as the structure of the systems themselves, had economic value to Defendant. (*Id.* at 117.) Maples and Titan Trailer took the information in an effort to save time and money, which is evidence of its value to Defendants. *Cf. Hamilton-Ryker Grp.*, 2010 WL 323057, at *15 (finding that "the

speed with which [Defendant] utilized [the] information to begin competing [Plaintiff] . . . demonstrates its independent economic value").

### 4. Money Spent to Develop

Hensley testified that Plaintiffs had spent at least $350,000 maintaining the Databases. (Doc. 115, at 15.) This is a significantly greater amount of money than the $21,000 that Titan Trailer paid to obtain its Southware license. (*See id.* at 77.) Further, expert witness Robert Elliott testified—without inputting any data—it would take approximately three months and around $30,000 to create Plaintiffs' customized Southware system from scratch. (*Id.* at 183–84.) Thus, the money spent to develop the Databases weighs in favor of trade-secret treatment.

### 5. Ease or Difficulty of Outside Acquisition

Plaintiffs have shown that it would be exceedingly difficult and costly to acquire or replicate the Databases. The full extent of the information in the Databases was not publicly available and was certainly not available in a single compilation. Further, the testimony shows that obtaining a customized Southware system and maintaining it would cost tens of thousands of dollars more than the cost of obtaining a general Southware license. (*See id.* at 15, 77, 183–84.) Finally, the time necessary to gather and input all the information in the Databases into another system—even a customized one—would be extensive.

Based on the Court's analysis of the relevant factors, it finds that Plaintiffs have fulfilled their burden of showing that the Databases are likely protectable trade secrets.

### b. Whether Defendants Misappropriated Plaintiffs' Trade Secrets

To show a likelihood of success on their trade-secrets claims, Plaintiffs must also demonstrate that Defendants likely misappropriated Plaintiffs' trade secrets. Here, despite

Defendants' contentions to the contrary, Plaintiffs have presented direct evidence that Defendants misappropriated the information in the Databases.

Under TUTSA, misappropriation includes acquisition of a trade secret by improper means or use of a trade secret by a person who used improper means to acquire knowledge of the secret. Tenn. Code Ann. § 47-25-1702(2). "Improper means" include "theft, bribery, misrepresentation, breach or inducement of a breach of a duty to maintain secrecy or limit use, or espionage through electronic or other means." *Id.* § 47-25-1702(1).

Defendants do not dispute whether Maples employed improper means—presumably theft—in acquiring the Databases, and it is evident from Maples's testimony that he at least acquired, but likely also used, the information in the Databases. At the hearing, Maples admitted that he downloaded the Databases and contracted with Stephen Powell to access the downloaded files for use in setting up the Titan Trailers Southware system. (Doc. 115, at 111–16.) Maples further admitted that his plan "was to have that [downloaded] system in place for a couple years and us buy our own system to try to save money." (*Id.* at 117.) Maples also testified that he could not say "that none of Knox Trailers' customer information was loaded into Titan Trailers' database." (*Id.* at 117–18.) Maples testified that he imported Knox Trailers's customer information, vendor information, and inventory information into the Titan Trailers system. (*Id.* at 147.) Maples further stated that he was unsure of the extent of Plaintiffs' customizations that Titan Trailers is using today. (*Id.* at 148.)

This evidence is sufficient to show that Maples likely misappropriated the Databases, and Plaintiffs have therefore established that they are likely to succeed on the merits of their trade-secrets claims.

### ii. Other Claims

Defendants argue that the other claims identified by Plaintiffs as relevant to the motion for preliminary injunction are preempted by their trade-secrets claims. (Doc. 91, at 10–12.) Specifically, Defendants argue that the unfair-competition claims, breach-of-fiduciary-duty claims, and conversion claims are all based on the alleged misappropriation of the "trade secrets" in the Databases, so these claims are preempted by the trade-secrets claims. (*Id.*) However, because the Court has already found that Plaintiffs are likely to succeed on their trade-secrets claims, the preemption of any of Plaintiffs' common-law claims will not impede the success of their motion for preliminary injunction. Accordingly, the Court need not resolve that issue at this time.

### B. Irreparable Injury to Plaintiffs

The key issue with respect to the irreparable-injury factor is whether the purported harm is in fact "irreparable." *Brake Parts, Inc. v. Lewis*, 443 F. App'x 27, 32 (6th Cir. 2011). Consequently, "[t]he possibility that adequate compensatory or other corrective relief will be available at a later date . . . weighs heavily against [the] claim." *Id.* (quoting *Sampson v. Murray*, 415 U.S. 61, 90 (1974)). "However, an injury is not fully compensable by money damages if the nature of the plaintiff's loss would make damages difficult to calculate." *Id.* (quoting *Basicomputer Corp. v. Scott*, 973 F.2d 507, 511 (6th Cir.1992)).

Here, Plaintiffs have shown that they will suffer irreparable harm in absence of an injunction. The Sixth Circuit has recognized that damages resulting from the loss of goodwill, customer relations, and fair competition are difficult to calculate and has held such harms irreparable. *See id.* at 32; *Basicomputer*, 973 F.2d at 512; *see also Collins Inkjet Corp. v. Eastman Kodak Co.*, 781 F.3d 264, 279 (6th Cir. 2015) ("It is appropriate to use a preliminary

injunction to avoid harms to goodwill and competitive position.").  Those are precisely the types of harm Plaintiffs have suffered and will continue suffer if Defendants are allowed continued use of information taken from the Databases.  The Court therefore finds that this factor weighs toward granting the preliminary injunction.

Further, the Court notes that it is deeply troubled by Defendants' failure to disclose the extent of the information that was taken from Plaintiffs to start Titan Trailer and by Maples's blatant lack of candor in his discovery responses.  Unquestionably, the injury to Plaintiffs—and the litigation costs for all parties—has been magnified by the delay attributable to Defendants' mendacious behavior in responding to discovery requests.  The Court **ADMONISHES** the parties, and Defendants in particular, that untruthful discovery responses and interactions with the Court will be looked on with great disfavor.  Such conduct is sanctionable *at best*. Defendants are **DIRECTED** to take a thorough look at the discovery responses they have submitted and promptly make any necessary amendments.

### C.  Substantial Harm to Others

Defendants have not identified any persons or entities beyond themselves that would be harmed by the injunction Plaintiffs seek.  However, the "harm" in not using another entity's trade secrets to compete with that entity is not the kind of harm that courts are concerned with preventing.  Further, as Plaintiffs point out, the injunction sought "will not preclude Mr. Maples and Titan from engaging in business, generating revenue, or even competing with Plaintiffs." (Doc. 85, at 27–28.)  Accordingly, the harm to others is low.

### D.  Public Interest

Finally, the public interest weighs in favor of granting the injunction.  The Court has already found that Plaintiffs are likely to succeed on their trade-secrets claims, and it is in the

public interest to prevent the misappropriation of trade secrets. *See, e.g., Hoover Transp. Servs., Inc. v. Frye*, 77 F. App'x 776, 785 (6th Cir.2003) (per curium) ("[T]he public has an interest in discouraging unfair trade practices[.]")

## IV. CONCLUSION

For the above reasons, Plaintiffs' motion for preliminary injunction (Doc. 84) is **GRANTED**. Defendants Titan Trailers and Billy Maples are hereby **ENJOINED** from using the Databases, or any document or tangible thing derived from information in the Databases.

**SO ORDERED.**

*/s/ Travis R. McDonough*
**TRAVIS R. MCDONOUGH**
**UNITED STATES DISTRICT JUDGE**